## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ANDREA GRIBBON**,
10550 Lake City Way NE Apt. 202
Seattle, WA 98125

**CHERICE PRATER**,
5310 Ixora Street
Zephyrhills, FL 33541

**HELGA HERTLEIN**,
2917 Sheila Drive, Apt. A
Kokomo, IN 46902

**DONALD CUSTER**,
6250 Waterfall Loop
Manitou Springs, CO 80829

**LYNNE BOISROND**,
270 East 2nd Street, 1F
Brooklyn, NY 11218

and

**DENNIS TITKO**,
65400 E Woodmere St.
Mount Hood Village, OR 97067

on behalf of themselves and
all others similarly situated,

      *Plaintiffs*,

  v.

**THE UNITED STATES OFFICE
OF PERSONNEL MANAGEMENT,**
1900 E Street, NW
Washington, DC 20415

**THE DEPARTMENT OF THE
TREASURY**,
1500 Pennsylvania Ave. NW
Washington, DC 20500

and

**THE SOCIAL SECURITY
ADMINISTRATION**,
1100 West High Rise,
6401 Security Boulevard,
Baltimore, MD 21235

      *Defendants*.

Case No.    1:26-cv-01575   

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

## I.    INTRODUCTION

1.    Plaintiffs ANDREA GRIBBON, CHERICE PRATER, HELGA HERTLEIN, DONALD CUSTER, LYNNE BOISROND, and DENNIS TITKO, on behalf of themselves and all others similarly situated ("Plaintiffs") file this action against THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT ("OPM"), THE DEPARTMENT OF THE TREASURY ("the Treasury"), and THE SOCIAL SECURITY ADMINISTRATION ("SSA") (collectively, "Defendants"), for damages resulting from Defendants' unlawful ongoing, systematic, and continuous disclosure of personal and financial information contained in Defendants' records to Elon Musk and other members of the so-called Department of Government Efficiency ("DOGE").

2.    Millions of individuals engage in financial transactions with the federal government. The government collects trillions of dollars from individuals who pay their income taxes, obtain government services, and pay back loans and other debts that they owe. People also receive money from the federal government. Social Security retirement and disability payments, federal tax refunds, veterans' benefits, and salaries and wages for federal workers are some examples of payment transactions that occur between ordinary individuals and federal agencies.

3.    The job of effectuating these financial transactions for the federal government belongs to the Treasury operating through the Bureau of the Fiscal Service ("the Bureau"). To carry out its duties, the Treasury collects and maintains sensitive personal and financial information about the individuals who are the counterparties to the transaction. The names, Social Security numbers, birth dates, birth places, home addresses, telephone numbers, email addresses, and bank account information of millions of individuals are maintained within the Treasury's records to enable the secure and timely transfer of funds between federal agencies and members of the public.

2

4.     Federal laws protect sensitive personal and financial information from improper disclosure and misuse, including by prohibiting disclosure to individuals who lack a lawful and legitimate need for it.

5.     In his first week as Treasury Secretary, Scott Bessent violated these restrictions. Elon Musk and/or other DOGE members had sought access to the Bureau's records for some time, only to be rebuffed by the employee then in charge of the Bureau. Within a week of being sworn in as Treasury Secretary, Mr. Bessent placed that civil servant on leave and granted DOGE-affiliated individuals full access to the Bureau's data and the computer systems that house them. He did so without making any public announcement, providing any legal justification or explanation for his decision, or undertaking the process required by law for altering the agency's disclosure policies.

6.     The scale of the intrusion into individuals' privacy is massive and unprecedented. Millions of people cannot avoid engaging in financial transactions with the federal government and, therefore, cannot avoid having their sensitive personal and financial information maintained in government records. Secretary Bessent's action granting DOGE-affiliated individuals full, continuous, and ongoing access to that information for an unspecified period of time means that retirees, taxpayers, federal employees, companies, and other individuals from all walks of life have no assurance that their information will receive the protection that federal law affords. And because Defendants' actions and decisions are shrouded in secrecy, affected individuals lack even basic information about what personal or financial information Defendants are sharing with outside parties or how their information is being used.

7.     People who must share information with the federal government should not be forced to share information with Elon Musk or his DOGE. Federal law confirms that they do not

have to. The Privacy Act of 1974 generally, and the Internal Revenue Code with respect to taxpayer information, make it unlawful for Secretary Bessent to hand over access to the Bureau's records containing individuals' personal information to Elon Musk or other members of DOGE. Plaintiffs bring this action to recover damages resulting from Defendants' systematic, continuous, and ongoing violation of federal laws that protect the privacy of personal information contained in federal records, including but not limited to reimbursement of the cost of credit monitoring and identity protection services.

## II.    JURISDICTION AND VENUE

8.     This Court has statutory jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

9.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers and agencies of the United States and because at least one defendant resides in Washington, D.C.

## III.    PARTIES

10.    Plaintiff Andrea Gribbon is a resident of the state of Washington. She is currently on federal disability and receives regular payments from the United States. To receive disability, Gribbon had to provide the United States with her Personal Sensitive Information ("PSI"), including her name, address, birth date, and Social Security number. Upon information and belief, Plaintiff Gribbon's PSI is among the records maintained in SSA's MBR, SSR, Numident, and EDW databases and Treasury's BFS payment systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices.[1] Plaintiff Gribbon learned about

---

[1] Government's Notice of Corrections to the Record, *Am. Fed'n of State, Cty. & Mun. Emps. v. Soc. Sec. Admin.*, No. 1:25-cv-00596-ELH (D. Md. Jan. 16, 2026), ECF No. 197 (admitting DOGE

4

Defendants' breaches of her PSI from media reports. In response, Plaintiff Gribbon purchased credit and identity theft monitoring through Experian.

11.     Plaintiff Cherice Prater is a resident of Florida. She is unemployed. Plaintiff Prater receives retirement benefits from OPM due to her deceased husband's 11.5 years of military service and 20 years with the U.S. Postal Service. She also receives disability payments administered by the Treasury. In order to receive these payments, Prater had to provide the United States with her Personal Sensitive Information ("PSI"), including her name, address, birth date and Social Security number. Upon information and belief, Plaintiff Prater's PSI is among the records maintained in OPM's EHRI and eOPF systems, SSA's MBR, SSR, Numident, and EDW databases, and Treasury's BFS payment and disbursement systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices.[2] Plaintiff Prater learned about Defendants' breaches of her PSI from media reports. In response, Plaintiff Prater purchased credit and identity theft monitoring through LifeLock.

12.     Plaintiff Helga C. Hertlein is a resident of Indiana. Plaintiff Hertlein is a United States taxpayer who, in the regular course of filing her tax returns, provided the Treasury with her Personal Sensitive Information ("PSI"), including her name, address, birth date and Social Security

---

officials were given "full access" to sensitive SSA data, that such data was transferred to third-party servers, and that the government cannot determine what data were shared or whether they remain); Complaint of Charles Borges, Former SSA Chief Data Officer, SSA Office of Special Counsel (Aug. 26, 2025), https://whistleblower.org/wp-content/uploads/2025/08/08-26-2025-Borges-Disclosure-Sanitized.pdf; *see also* Meryl Kornfield & Elizabeth Dwoskin, *DOGE Member Took Social Security Data on a Thumb Drive, Whistleblower Alleges*, Wash. Post (Mar. 10, 2026), https://www.washingtonpost.com/politics/2026/03/10/social-security-data-breach-doge-2/; Letter from Rep. Robert Garcia, Ranking Member, H. Comm. on Oversight & Gov't Reform, to Michelle L. Anderson, Assistant Inspector General, SSA Office of the Inspector General (Mar. 9, 2026), https://oversightdemocrats.house.gov/imo/media/doc/2026-03-09garciatoandersonletterredogessaoig.pdf.

[2] *See supra*, note 1.

number. Upon information and belief, Plaintiff Hertlein's PSI and return information are among the records maintained in SSA's MBR, SSR, Numident, and EDW databases and Treasury's BFS payment and disbursement systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices.[3] Plaintiff Hertlein learned about Defendants' breaches of her PSI from media reports. Plaintiff Hertlein purchased credit and identity theft monitoring indicating that her email address, phone number, home address, and Social Security number have been found on the dark web. In response to these alerts and related suspicious activity, Plaintiff Hertlein has spent more than 40 hours addressing these issues, including placing a credit freeze, disputing multiple items on her credit report, and working through calls and documentation to have those items investigated and removed. Plaintiff Hertlein ultimately purchased through LifeLock.

13.    Plaintiff Donald Robert Custer, III, is a resident of Colorado. Plaintiff Custer is a United States taxpayer who, in the regular course of filing his tax returns, provided the Treasury with his Personal Sensitive Information ("PSI"), including his name, address, birth date and Social Security number. Upon information and belief, Plaintiff Custer's PSI and return information are among the records maintained in SSA's MBR, SSR, Numident, and EDW databases and Treasury's BFS payment and disbursement systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices.[4] Plaintiff Custer learned about Defendants' breaches of his PSI from media reports. In response, Plaintiff Custer purchased credit and identity theft monitoring through Experian.

14.    Plaintiff Lynne Boisrond is a resident of New York. Plaintiff Boisrond, at all times relevant to this complaint, currently or formerly has received student loans through the

---

[3] *Id*.
[4] *Id*.

government. In the regular course of applying for government financial aid Plaintiff Boisrond provided her Personal Sensitive Information ("PSI") including her name, address, date of birth, driver's license number, and Social Security number to the Department of Education. Upon information and belief, Plaintiff Boisrond's PSI is among the records maintained in SSA's MBR, SSR, Numident, and EDW databases and Treasury's BFS payment and disbursement systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices. Plaintiff Boisrond learned about Defendants' breaches of her PSI from media reports. On February 1, 2025, Boisrond received an alert of an unauthorized attempted charge to her Capital One account in the amount of $35.00. Additionally, Plaintiff Boisrond was notified that her email, date of birth, and address were found on the dark web. In response, Plaintiff Boisrond purchased credit monitoring through LifeLock.

15. Plaintiff Dennis Titko is a resident of Oregon. Plaintiff Titko is a United States taxpayer who, in the regular course of filing his tax returns, provided the Treasury with his Personal Sensitive Information ("PSI"), including his name, address, birth date and Social Security number. Upon information and belief, Plaintiff Titko's PSI and return information are among the records maintained in SSA's MBR, SSR, Numident, and EDW databases and Treasury's BFS payment and disbursement systems that DOGE personnel accessed and, in some instances, copied to external servers and personal devices[5]. Titko learned about Defendants' breaches of his PSI from media reports. On February 11, 2025, Titko was notified by Wells Fargo that an account had been opened in his name. Titko did not open an account with Wells Fargo. Titko spent time communicating with Wells Fargo to alert them to this fraud attempt and close the fraudulent account. Plaintiff Titko upgraded his credit and identity theft monitoring service with LifeLock.

---

[5] *Id*.

16.    Defendant United States Department of Personnel Management is an agency of the United States, headquartered in Washington, D.C.

17.    Defendant Department of the Treasury is an agency of the United States, headquartered in Washington, D.C.

18.    Defendant Social Security Administration is an agency of the United States, headquartered in Baltimore, Maryland.

## IV.    FACTS

Defendants' Collection and Maintenance of Information on Individuals

19.    Defendants are responsible for managing the finances of the United States Government. Their responsibilities include collecting receipts owed to the government and disbursing payments to recipients of public funds. 31 U.S.C. §§ 3301, 3321. In fiscal year 2024, the Treasury processed nearly $5 trillion in receipts, including $2.4 trillion from individual income taxes, $1.7 trillion from Social Security taxes, and $530 billion from corporate income taxes. In that fiscal year, the Treasury handled $6.752 trillion in outlays, including $1.46 trillion for Social Security payments and $874 billion in defense spending.[6] The U.S. Treasury manages the largest collections, payments, cash management, and financial operation in the world.

20.    To engage in financial transactions with individuals, Defendants must collect and maintain personal and financial information about those individuals. As federal agencies, the Treasury and the Bureau are subject to the requirements of the Privacy Act, 5 U.S.C. § 552a, with respect to records that they maintain on individuals.

---

[6] U.S. DEP'T OF TREAS., BUR. OF FISCAL SERV., *Final Monthly Treasury Statement, Receipts and Outlays of the United States Government For Fiscal Year 2024 Through September 30, 2024, and Other Periods* 4.

21.     OPM operates as the federal government's chief human resources agency. In that capacity, Defendant OPM maintains electronic personnel files containing certain PSI, through its Enterprise Human Resources Integration ("EHRI") program. As part of the EHRI program, OPM manages access to the electronic Official Personnel Folder ("eOPF") for federal employees across agencies of the Executive Branch, and collects, integrates, and publishes data for approximately 2 million federal employees on a bi-weekly basis.

22.     PSI maintained by Defendant OPM includes, among other information, copies of federal employees' birth certificates, documents identifying their Social Security numbers and birth dates, personal biographical information, disability status and health insurance program enrollment information, 401(k) enrollment information, personnel action investigations, character and fitness investigations, and more.

23.     Defendant OPM also oversees background checks and security clearance investigations, for which it collects and maintains additional sensitive personal information, including PSI, for federal employees and applicants, including passport information, residency details, fingerprints and records pertaining to employees' psychological and emotional health and finances.

24.     Defendant SSA processes payments for Social Security retirement and disability benefits and collects and maintains a variety of Plaintiffs' and other beneficiaries' personal information, including their Social Security numbers, bank account information, birth certificates, documents reflecting their Social Security numbers and birth dates, health insurance information, and disability status. SSA maintains several databases that house Americans' most sensitive personal information. The Master Beneficiary Record ("MBR"), Supplemental Security Record ("SSR"), and Numident files contain detailed information about anyone who applies for, or

receives, Title II or Title XVI benefits. The Enterprise Data Warehouse ("EDW") contains extensive information about anyone with a Social Security number, including names, names of spouses and dependents, work history, financial and banking information, immigration or citizenship status and marital status. The Numident file contains information necessary for assigning and maintaining Social Security numbers.

25.    Each of the databases and systems described above constitutes a "system of records" within the meaning of 5 U.S.C. § 552a(a)(5), meaning a group of records under the control of a federal agency from which information is retrieved by an individual's name or other identifying particular, including Social Security number. The records maintained in OPM's EHRI and eOPF systems, SSA's MBR, SSR, Numident, and EDW databases, and Treasury's Bureau of the Fiscal Service payment and disbursement systems are all retrieved by such identifiers and therefore qualify as "records" under 5 U.S.C. § 552a(a)(4), as they contain information about identifiable individuals maintained by a federal agency. Plaintiffs and Class Members are individuals whose information is maintained within these systems.

26.    Federal laws protect PSI from improper disclosure and misuse, including by barring disclosure to individuals who lack a lawful and legitimate need for it or who lack proper security clearance to access such information. Prior to January 2025, only individuals with a "need to know" (i.e., individuals who are conducting background checks, and suitability determinations, among others) could access PSI; prior to gaining access, those personnel must have undergone their own security clearance process.

27.    The Privacy Act prohibits the disclosure of a record about an individual to any person or another agency unless the individual to whom the record pertains consents or a statutory exception applies. 5 U.S.C. § 552a(b).

10

28.    DOGE's access to and use of the return information maintained in Treasury's Bureau of the Fiscal Service payment systems was not undertaken for any legitimate "tax administration" purpose within the meaning of 26 U.S.C. § 6103(b)(4). Tax administration, as defined by statute, means the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws. DOGE's stated mission was to identify waste, fraud, and abuse in federal spending and to "modernize" government technology generally, and DOGE personnel did not perform functions such as determining tax liability, processing tax returns, or conducting audits that constitute tax administration.[7] To the extent any DOGE personnel were treated as Treasury or IRS officers or employees, their access to return information in BFS systems was not necessary to their official duties for tax administration purposes under § 6103(h)(1), and § 6103 authorizes no other exception that would cover the disclosures at issue here.

29.    Because Defendants process tax-related transactions, they are also subject to the confidentiality requirements of the Internal Revenue Code, 26 U.S.C. § 6103. Section 6103 provides that returns and return information shall be confidential and cannot be disclosed by a federal officer or employee unless authorized by statute. "Return and return information" includes the taxpayer's identity, mailing address, taxpayer identification number, claims for refund, and other information on tax returns. *Id.* § 6103(b)(1), (2), (6). The officers and employees of the Treasury may access return and return information if their official duties require such inspection or disclosure for tax administration purposes. *Id.* § 6103(h)(1).

---

[7] Establishing and Implementing the President's "Department of Government Efficiency," Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 29, 2025), and Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative, Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Mar. 3, 2025).

Defendants' Disclosure of Bureau Records on Individuals to DOGE

30.     Beginning shortly after the inauguration of President Donald Trump on January 20, 2025, Defendants OPM, Treasury, and SSA illegally and improperly violated these restrictions on disclosure of PSI by giving access to that PSI to individuals without a lawful or legitimate need for such data and without their having undergone the security clearance process.

31.     President Trump was inaugurated as President on January 20, 2025. The same day, he issued an executive order establishing a so-called "Department of Government Efficiency." Under the executive order, the United States Digital Service was renamed the United States DOGE Service ("USDS"), and a temporary organization was established under 5 U.S.C. § 3161 entitled the U.S. DOGE Service Temporary Organization.

32.     The executive order directs the USDS Administrator to work with Agency Heads to "promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." It also directs agency heads to take "all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." The executive order purports to displace "all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above."

33.     On February 11, 2025, President Trump signed Executive Order 14,210 titled "Implementing the President's Department of Government Efficiency Workforce Optimization Initiative." Section 3(b) of the order requires each Agency Head to develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas. The order states that hiring plan decisions shall be made in consultation with the

agency's DOGE Team Lead, and that the agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

34. Since his inauguration, President Trump has not formally identified the individual who would serve as USDS Administrator or the full list of individuals that are part of the U.S. DOGE Service Temporary Organization.

35. During the presidential campaign, President Trump announced that billionaire entrepreneur Elon Musk would have a leadership role in DOGE. It is widely reported that, since the inauguration, Mr. Musk has played a leadership role in DOGE activities across the federal government.

36. The Trump administration has not publicly revealed whether Mr. Musk has been made an officer or employee of the U.S. government or remains a private citizen. The Trump administration also has not publicly revealed the employment status of other individuals who are part of DOGE.

37. Elon Musk and other DOGE-affiliated individuals who accessed PSI and return information held by OPM, SSA, and Treasury did so under the auspices of those agencies. They were issued government credentials and equipment, embedded within agency facilities, supervised by agency officials on a day-to-day basis, and granted access to agency systems pursuant to determinations made by agency leadership. They thereby functioned as officers or employees of the United States with respect to the access to, inspection of, and disclosure of records alleged herein. The United States is therefore liable under the Privacy Act, 5 U.S.C. § 552a, and under 26 U.S.C. § 7431(a)(1) for these unauthorized disclosures.

38.     Sometime after November 5, 2024, DOGE representatives reportedly approached officials in the Treasury seeking access to the agency's payment systems. DOGE's efforts to obtain access continued after President Trump's inauguration.

39.     Initially, DOGE's requests for access to the Treasury's payment systems were reportedly rebuffed by David A. Lebryk, the highest-ranking career official at the agency and the individual then in charge of the Bureau. According to press reports, Mr. Lebryk advised DOGE representatives during the transition period that the information contained in the payment systems was proprietary and should not be shared outside of the government.

40.     On January 27, 2025, the Senate confirmed Mr. Bessent as President Trump's Treasury Secretary, and he was sworn in the following day. On information and belief, Secretary Bessent and his chief of staff Dan Katz had a meeting with Mr. Lebryk later that week, after which Mr. Lebryk was placed on administrative leave. On Friday, January 31, Mr. Lebryk announced that he was retiring from the Treasury after 35 years in federal service.

41.     On information and belief, on Friday evening, January 31, Secretary Bessent gave representatives of DOGE full access to the federal payment system.[8] Senator Ron Wyden, Ranking Member of the Senate Committee on Finance, has reported that DOGE's access to Treasury's payment system is "complete." He has stated that DOGE has "full access to this system. Social Security and Medicare benefits, grants, payments to government contractors.... All of it."[9]

42.     Defendants have not released the full list of DOGE-affiliated individuals who have been provided access to the Treasury's payment systems, or whether those individuals are

---

[8] Andrew Duehren et al., *Elon Musk's Team Now Has Full Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025).
[9] @wyden.senate.gov, BLUESKY (Feb. 1. 2025, 3:37 PM), https://bsky.app/profile/wyden.senate.gov/post/3lh5ejpwncc23.

employees of the Bureau, the Treasury, another agency, or a private enterprise. Tom Krause, the Chief Executive Officer of Cloud Software Group (according to that company's website, *see* https://www.cloud.com/leadership) is reported to be working at the Treasury.[10] Further, Secretary Bessent has reportedly signed off on a plan to give access to the payment system to a team led by Mr. Krause, who is identified in the article as "a liaison to Musk's DOGE group that operates out of the USDS."[11] Defendants have not publicly disclosed the members of Mr. Krause's team or provided the details of the plan for access that Secretary Bessent reportedly signed off on. Although an anonymous source assured that "no one outside Treasury would have access to the payment system," the source apparently did not indicate whether information contained in the payment system would be disseminated outside of the Bureau.

43.     Upon information and belief, the access that Secretary Bessent approved for Mr. Krause and the team he led included access to the Bureau of the Fiscal Service's payment and disbursement systems and to the taxpayer return information contained in those systems, including names, mailing addresses, Social Security numbers, taxpayer identification numbers, and refund-related payment data for millions of taxpayers. Upon information and belief, at least some members of Mr. Krause's team were, at the time they obtained access, private persons who had not yet been formally appointed as officers or employees of the United States.

44.     Mr. Musk, a private citizen and private company CEO, has suggested that the DOGE team has the unilateral authority to control disbursements at the Bureau. In response to an allegation by General Mike Flynn (ret.) that certain federal grants to Lutheran Family Services and

---

[10] Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025).

[11] Michael Stratford et al., *Trump administration gives Musk allies access to Treasury payment system*, POLITICO (Feb. 1, 2025).

affiliated organizations should end, Mr. Musk responded on X (formerly Twitter) that "The DOGE team is rapidly shutting down these illegal payments."[12]

45.     Moreover, Musk, seemingly confused about the functions of the Bureau, further emphasized his intentions to stop certain payments by alleging the longtime civil servants at the Bureau of Fiscal Service were criminals. Musk contended: "Career Treasury officials are breaking the law every hour of every day by approving payments that are fraudulent or do not match the funding laws passed by Congress. This needs to stop NOW!"[13]

46.     Notably, the Bureau does not independently make eligibility determinations for payments. 31 U.S.C § 3325 authorizes the Treasury to disburse payments after it has been properly certified. Therefore, Musk and his DOGE team gaining access to highly sensitive private information is even more alarming and constitutes clear evidence of the security risk.

47.     Mr. Musk was labeled a "special government employee" by the White House. An employee of this nature is authorized to work for the government for only 130 days or less in a 365-day period.[14]

48.     Treasury Order 105-19 states that delegated officials are required to ensure that personnel in that official's organization with a security clearance for access to classified information are proficient with processing, marking, and safeguarding requirements for classified information.[15]

---

[12] @elonmusk, X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.

[13] @elonmusk, X (Feb. 2, 2025, 2:27 PM), https://x.com/elonmusk/status/1886134485822922785.

[14] U.S. DEP'T OF JUST., JUST. MGMT. DIV., *Summary of Government Ethics Rules for Special Government Employees* (Feb. 6, 2006), https://www.justice.gov/jmd/ethics/summary-government-ethics-rules-special-government-employees (last visited Feb. 12, 2025).

[15] U.S. DEP'T OF TREAS., Treasury Order 105-19 (June 27, 2011), https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-105-

49.     The systems Musk and his DOGE team accessed are subject to strict access and logging requirements. Individuals who do not possess the credentials needed to access the OPM, SSA, and Treasury systems have breached the security of those systems.

50.     Defendants had a duty to deny access to Defendant Musk and his DOGE employees unless they had the proper credentials or authority. Instead, Defendants permitted a major security breach of highly sensitive private information. Defendants ignored the rule of law and allowed for unwarranted unauthorized access to PSI.

51.     These events, including the grant of system level access to DOGE-affiliated individuals, their use of that access to obtain and transmit files containing taxpayers' return information, the transfer of data from Treasury and SSA systems to external or third-party locations, and the copying of such data to removable media, reflect multiple, discrete acts of unauthorized inspection and disclosure of return information and other PSI.

52.     Upon information and belief, Musk and his DOGE team did not undergo a proper background check nor receive appropriate security clearances to access the highly sensitive data. Additionally, special government employees are prohibited from using their public office for private gain or that of his or her friends, relatives, or persons whom they are affiliated with.[16] More concerningly, Musk still maintains his role as the CEO of private companies, many of which solicit and accept government contracts.

53.     In late January 2025, employees at OPM were instructed to provide information on federal employees to Amanda Scales, a former employee of Elon Musk who, upon information

---

19#:~:text=Ensure%20that%20personnel%20in%20that,/or%20bureau%20security%20officials (last visited Feb. 12, 2025).

[16] 5 C.F.R. § 2635.702; *Summary of Government Ethics Rules for Special Government Employees*, *supra* note 8.

and belief, is acting under Mr. Musk's orders. Although Scales neither had the requisite security clearance to access the data nor was a government employee at that time, she was nevertheless allowed to access and control the massive database holding information on millions of federal employees, including Plaintiffs' PSI.

54. Upon information and belief, Musk did not undergo the required training to access highly confidential files, posing a potential national security risk. Typically, personnel with access to these files receive specialized training to ensure the security of systems containing highly sensitive private information. Such training is also essential to mitigate the risk of threat actors gaining unauthorized access to this data.

55. Scales improperly granted Musk full access to OPM's data and the computer systems that house such data, doing so without legal justification, and without making any efforts to ensure that disclosures were made consistent with OPM's policies.

56. Musk and his DOGE team, without authorization, obtained access to computers maintained by the Department of Education, giving them access to student loan data, including Social Security numbers, dates of birth, and contact information, for millions of federal student loan borrowers.

57. Experts immediately sounded public alarms about DOGE's access to government data. They voiced concerns about changes in agency security protocols, warning that data could be transferred or siphoned elsewhere, potentially for private use. They also warned that critical data was vulnerable to foreign adversaries and malevolent hackers. One expert opined, "If I were a nation like China, Russia, or Iran, I'd be having a field day with a bunch of college kids running around with sensitive federal government data on unencrypted hard drives."

Wholesale Access to SSA Records

18

58.    In late January 2025, DOGE immediately started seeking access to SSA databases. Treasury Secretary Scott Bessent granted DOGE-affiliated individuals full access to the Bureau of the Fiscal Service's data and computer systems. According to public reports, these individuals had not obtained security clearances or completed the requisite training before gaining access to federal employees' personal information.

59.    On or about January 30, 2025, Lee Dudek, who was then serving as a senior advisor in SSA's Office of Program Integrity, received a communication from DOGE requesting that DOGE associates, including Michael Russo and Scott Coulter, be allowed to work at SSA.

60.    Russo came onsite on January 31, 2025, to begin his onboarding process and joined the Agency as the Chief Information Officer on February 3, 2025. Russo introduced himself as a DOGE representative to multiple employees on multiple occasions. As soon as Russo joined the SSA, he requested to bring in a software engineer named Akash Bobba, who was already assisting DOGE in multiple agencies.

61.    On February 10, 2025, there were urgent communications about onboarding Bobba and giving him the equipment and credentials he needed to access SSA data before midnight on February 10. Bobba was sworn in over the phone at around 9 p.m. that evening, contrary to standard practice. The request for same-day access for Bobba was unprecedented and raised concerns about the urgency with which Bobba needed to be onboarded and given access to SSA's systems and data.

62.    Because Bobba's security training was truncated and done outside normal processes, he did not have sufficient understanding of the sensitive nature of SSA data or the ways to ensure such data's confidentiality.

63.     Bobba was initially provided anonymized and read-only Numident data using a standard sandbox approach. However, Russo and other DOGE officials demanded that Mr. Bobba be given immediate, full access to SSA data in the Enterprise Data Warehouse (EDW), which included Numident files, the Master Beneficiary Record (MBR) files, and the Supplemental Security Record (SSR) files. Russo repeatedly stated that Mr. Bobba needed access to "everything," including source code.

64.     On February 14, 2025, Dudek was placed on administrative leave based on allegations of inappropriate conduct. On February 16, 2025, President Trump named Mr. Dudek as the Acting Commissioner of SSA, although Dudek was on administrative leave at the time.

65.     Upon Dudek's elevation to Acting Commissioner, Dudek gave Bobba and the DOGE team access to at least the EDW database, and possibly other databases, without proper justification or adherence to SSA's standard procedures for data access.

66.     According to public reports, the Treasury Department gave 25-year-old Marko Elez, who was not yet a government employee, direct access to its payment systems. Elez later sent an unencrypted spreadsheet with sensitive data to individuals outside of the department.

67.     Upon information and belief, the "sensitive data" that Elez transmitted from Treasury's payment systems included taxpayer return information within the meaning of 26 U.S.C. § 6103(b)(2), and his transmission of that information was without authorization and contrary to Treasury and Bureau of the Fiscal Service policy.

68.     SSA allegedly gave control over a sensitive personnel database to former Musk employee Amanda Scales, who was not yet employed by the government. Similarly inappropriate disclosures to other Musk associates followed.

20

NLRB Whistleblower Disclosure

69.     In May 2025, National Labor Relations Board ("NLRB") IT staffer Daniel Berulis, who oversaw the agency's day-to-day cybersecurity operations, lodged a whistleblower disclosure with Congress. Among other red flags, Berulis revealed that after DOGE gained access to the NLRB's internal systems, there was a spike in data leaving the agency, and a Russian IP address repeatedly tried to access the systems.

70.     Berulis explained that he had been ordered not to follow standard operating procedures with regard to DOGE's accounts or DOGE staffers' access to information. Berulis also reported that DOGE representatives may not have followed proper security protocols for their accounts. He ultimately discovered that data containing sensitive information of parties with business before the agency had been transferred from the agency's systems to an unknown external location.

Government Admissions of Data Mishandling

71.     In January 2026, in the AFSCME litigation in the United States District Court for the District of Maryland (Case No. 1:25-cv-00596-ELH), the government filed a Notice of Corrections to the Record. Among other things, the government acknowledged that DOGE officials had been "given full access to systems and files containing sensitive individualized data" and that at least one of them "copied a non-SSA employee on an email that included a file that contained sensitive information for roughly 1,000 people."

72.     Further, the government admitted that DOGE had used third-party servers and that "the government has not been able to determine exactly what data were shared to the server or whether the data still exist on the server."

73.    The government also revealed that a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain states. In connection with these communications, one of the DOGE team members signed a Voter Data Agreement, in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Fourth Circuit Findings in American Federation

74.    On April 10, 2026, the United States Court of Appeals for the Fourth Circuit issued its opinion in *American Federation of State, County & Municipal Employees v. Social Security Administration*, No. 25-1411 (4th Cir. 2026). The court held that the organizational and individual plaintiffs had demonstrated Article III standing to challenge DOGE's access to SSA data, finding that the unauthorized access to their sensitive personal information closely resembled the common-law tort of intrusion upon seclusion.[17]

75.    The Fourth Circuit's opinion recounted the government's admissions in detail. Among other things, the court observed that from March 7 to March 17, 2025, DOGE affiliates at SSA used an unauthorized third-party server operated by Cloudflare—a platform not approved for storing SSA data and outside SSA's security protocols—to share agency data. The government conceded that it has not been able to determine exactly what data were shared to the server or whether the data still reside there.

---

[17] *Am. Fed'n of State, Cty. & Mun. Emps. v. Soc. Sec. Admin.*, No. 25-1411 (4th Cir. Apr. 10, 2026). The court acknowledged that the government had provided inaccurate information to the district court during the preliminary injunction proceedings. A significant portion of the factual representations that the government made to the district court in support of its position were later revealed to be false when the government filed a "Notice of Corrections to the Record."

76.     The court further noted that a political advocacy group had contacted two members of SSA's DOGE Team and requested that they analyze state voter rolls the group had acquired, with the stated aim of finding evidence of voter fraud and overturning election results in certain States. In response, one DOGE team member, acting in his official capacity as an SSA employee, signed a "Voter Data Agreement" with the advocacy group on March 24, 2025. The court described these revelations as "alarming" and observed that they "raise serious questions about [the government's] earlier conduct before the district court."

77.     The Fourth Circuit's standing analysis and factual findings further confirm that Defendants' disclosure of Plaintiffs' and Class Members' PSI to DOGE personnel constituted a cognizable invasion of privacy. The court's recognition that the government provided inaccurate information to the district court in the AFSCME proceedings underscores the extent to which Defendants have acted in disregard of their legal obligations and of the rights of individuals whose data they are entrusted to protect.

Whistleblower Allegations of Data Theft on Thumb Drive

78.     On or about January 9, 2026, a whistleblower filed a complaint with the SSA Inspector General alleging that a former U.S. DOGE Service employee claimed he had access to two highly sensitive SSA databases and planned to share the information with his private employer.

79.     According to the whistleblower complaint, the former DOGE software engineer, who worked at SSA in 2025 before starting a job at a government contractor in October 2025, allegedly told several co-workers that he possessed two tightly restricted databases of U.S. citizens' information—Numident and the Master Death File—and had at least one on a thumb drive.

80. The databases include records for more than 500 million living and dead Americans, including Social Security numbers, places and dates of birth, citizenship, race and ethnicity, and parents' names.

81. While working at DOGE, the engineer had approved access to Social Security data. According to the complaint, he allegedly told the whistleblower that he needed help transferring data from a thumb drive to his personal computer so that he could "sanitize" the data before using it at the company. The engineer told colleagues that once he had removed personal details from the data, he wanted to upload it into the company's systems.

82. The complaint alleges that the former DOGE member told colleagues he had kept his agency computer and credentials, which he allegedly said carried "largely unrestricted 'God-level' security access" to the agency's systems—a level of access no other company employee had been granted in its work with SSA.

83. The SSA Inspector General's office is investigating the disclosure and has alerted members of Congress of its existence. The Inspector General's office has also shared the disclosure with the Government Accountability Office, which has been conducting its own audit of DOGE's access to data.

84. In August 2025, SSA's former chief data officer, Charles Borges, filed a separate complaint alleging that members of DOGE improperly uploaded copies of Americans' Social Security data to a digital cloud, putting individuals' private information at risk.

85. Plaintiffs and Class Members are among the millions of people who receive money from the federal government using the Bureau's payment, collections, and electronic funds systems, including monthly Social Security retirement payments from the Treasury, Railroad Retirement Benefits, pension income for federal government service, disability and workers'

compensation benefits under the Federal Employees Compensation Program, federal black lung benefits and veterans' benefits.

86.     Plaintiffs and the Members of the Taxpayer Subclass also pay federal income taxes or receive refunds, have done so in prior tax years, and will do so again the current tax season.

87.     The Bureau will collect and maintain personal and financial information about Plaintiffs and Members of the Taxpayer Subclass to make the income payments and benefits they are owed and to process their tax payments or refunds.

Defendants' Unlawful Actions Harm the Plaintiffs and Members of the Classes

88.     Defendants have the statutory responsibility to protect the sensitive personal and financial information that they collect and maintain about individuals from unnecessary and unlawful disclosure to third parties. Defendants have acted inconsistently with that responsibility by granting individuals associated with DOGE access to the extensive records that the Bureau, SSA, OPM, and other agencies maintain on every individual with whom they engage in financial transactions. Moreover, Defendants have taken this action without obtaining or seeking the consent of affected individuals.

89.     Plaintiffs and Members of the Classes rely on Defendants' payment, collection, and other systems to make and receive payments from the government. They do not have the option of avoiding dealing with Defendants to avoid improper disclosure or misuse of their personal and financial information. Defendants' actions have thus harmed Plaintiffs and Members of the Classes by depriving them of privacy protections guaranteed to them by federal law and, consequently, the ability to decide for themselves whether Elon Musk or other individuals should be able to obtain and use their personal data to advance DOGE's agenda.

90.　　As a result of Defendants' violations of law, Plaintiffs and Class Members have sustained and will continue to sustain economic loss and other harm. They have experienced and/or face an increased risk of experiencing the following forms of injuries:

A.　　money expended for purchase costs from the purchase of credit monitoring and identity theft protection services;

B.　　money and time expended to prevent, detect, contest, and repair identity theft, fraud, and other unauthorized uses of PSI, including by identifying, disputing, and seeking reimbursement for fraudulent activity and canceling compromised financial accounts and associated payment cards;

C.　　money and time lost as a result of fraudulent access to and use of their financial accounts, some of which accounts were never reimbursed;

D.　　loss of use of and access to their financial accounts and/or credit;

E.　　diminished prospects for future employment and/or promotion to positions with higher security clearances as a result of their PSI having been compromised;

F.　　money and time expended to order credit reports and place temporary freezes on credit, and to investigate options for credit monitoring and identity theft protection services;

G.　　money and time expended to avail themselves of assets and/or credit frozen or flagged due to misuse;

H.　　impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

I.　　money and time expended to ameliorate the consequences of the filing of fraudulent income tax returns, including by completing paperwork associated

with the reporting of fraudulent returns and the manual filing of replacement returns;

J.    lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the unauthorized disclosures, including efforts to research how to prevent, detect, contest, and recover from misuse of PSI;

K.    loss of the opportunity to control how their PSI is used;

L.    continuing risks from the unmasking of confidential identities;

M.    continuing risks to their PSI and that of their family members, friends, and associates, which remains subject to further harmful exposure and theft as long as Defendants fail to undertake appropriate, legally required steps to protect the PSI in its possession; and

N.    anxiety, distress, and concern about the security of their personal information and the ongoing invasion of their privacy, to the extent recoverable under applicable law.

## V.    CLASS ACTION ALLEGATIONS

91.    Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and/or (b)(1), (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, predominance, and superiority requirements.

92.    The proposed Classes are defined as:

The PSI Class: All individuals whose Personal Sensitive Information ("PSI") was maintained in any federal system of records and was made

available for access by DOGE or by DOGE-created user accounts between January 1, 2025, and May 4, 2026.

The Taxpayer Subclass: All Members of the PSI Class who are individual taxpayers and whose "return information," as defined in 26 U.S.C. § 6103(b)(2), was maintained in the Department of the Treasury's Bureau of the Fiscal Service payment and disbursement systems and was accessed by DOGE-affiliated individuals between January 20, 2025, and May 4, 2026.

(a) Excluded from the Class are: (i) the United States, its agencies, and its officers and all current and former employees acting in their official capacities; (ii) DOGE personnel; and (iii) the Court and its staff.

93.     Plaintiffs Gribbon, Prater, Hertlein, Custer, Boisrond, and Titko are proposed representatives of the PSI Class. The claims of the PSI Class representatives are typical of the claims of the PSI Class in that their PSI was maintained in federal systems of records and was made available for access by DOGE or DOGE-created user accounts, and they have suffered the same categories of harm as other PSI Class Members arising from the same course of conduct by Defendants.

94.     Plaintiffs Hertlein, Custer, and Titko are proposed representatives of the Taxpayer Subclass. The claims of the Taxpayer Subclass representatives are typical of the claims of the Taxpayer Subclass in that their return information was maintained in Treasury's Bureau of the Fiscal Service payment and disbursement systems that DOGE-affiliated individuals accessed, and they have suffered the same categories of harm as other Taxpayer Subclass Members arising from the same course of conduct by Defendants.

95.     Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into further subclasses, or modified in any other way.

Numerosity and Ascertainability

96.     The size of the Class cannot be estimated with reasonable precision, but it likely numbers in the millions. The number is great enough that joinder is impracticable. The disposition of their claims in a single action will provide substantial benefits to all parties and to the Court.

97.     Class Members are readily ascertainable from information and records in the possession, custody, or control of Defendants. Notice of this action can be readily provided to the Class.

Typicality

98.     Plaintiffs' claims are typical of the claims of the Class in that the sensitive personal information of the representative Plaintiffs, like that of all Class Members, was compromised by Defendants' unauthorized disclosures.

Adequacy of Representation

99.     Plaintiffs are Members of the proposed Classes and will fairly and adequately represent and protect its interests. Plaintiffs' counsel are competent and experienced in class action and privacy litigation and will pursue this action vigorously. Plaintiffs have no interests contrary to or in conflict with the interests of Class Members.

Predominance of Common Issues

100.    Common questions of law and fact exist as to all Members of the Classes and predominate over any questions solely affecting individual Class Members. Among the questions of law and fact common to the Class are:

29

a. Whether Defendants, in violation of the Privacy Act, disclosed Plaintiffs' and Class Members' PSI without their prior written consent for no statutorily permitted purpose;

b. Whether Defendants, acting through DOGE-affiliated individuals, disclosed Plaintiffs' and Class Members' return information without authorization in violation of 26 U.S.C. § 6103, and whether such disclosures give rise to civil liability under 26 U.S.C. § 7431(a)(1); and

c. Whether Plaintiffs and Class Members are entitled to damages and declaratory and injunctive relief.

Superiority

101. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that few, if any, Class Members could afford to seek redress for Defendants' violations.

102. Class treatment of common questions of law and fact would also be a superior method to piecemeal litigation in that class treatment will conserve the resources of the courts and will promote consistency and efficiency of adjudication.

103. Class-wide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1), (b)(2), and/or (c)(4) because Defendants have acted on grounds that apply generally to the Class, and inconsistent adjudications would establish incompatible standards and substantially impair the ability of Class Members and Defendants to protect their respective interests. Class-wide relief assures fair, consistent, and equitable treatment of Class Members and Defendants.

**VI.    CAUSES OF ACTION**

**COUNT ONE**
**Unauthorized Disclosure of Return Information, 26 U.S.C. § 7431(a)(1)**
**against Defendants OPM and Treasury**
**(On Behalf of Plaintiffs Hertlein, Custer, Titko, and the Taxpayer Subclass)**

104.    Plaintiffs hereby incorporate by reference each and every material fact contained in the preceding paragraphs of this Complaint.

105.    The Treasury Department is an agency of the United States subject to the confidentiality requirements of 26 U.S.C. § 6103. The Bureau of the Fiscal Service's payment and disbursement systems contain "return information" within the meaning of 26 U.S.C. § 6103(b)(2), including taxpayer identity, mailing addresses, Social Security numbers, taxpayer identification numbers, and refund-related account and payment data for millions of taxpayers who have engaged in financial transactions with the federal government.

106.    Plaintiffs Hertlein, Custer, and Titko, and Members of the Taxpayer Subclass, are taxpayers whose return information, as defined by 26 U.S.C. § 6103(b)(2), was maintained in Treasury's payment and disbursement systems at all relevant times.

107.    Secretary Bessent is an officer of the United States. Beginning on or about January 31, 2025, Secretary Bessent knowingly and willfully authorized and directed the disclosure of sensitive taxpayer data or return information maintained in Treasury's payment systems to DOGE-affiliated individuals by granting those individuals access to the Bureau of the Fiscal Service's systems and the return information contained therein. No provision of 26 U.S.C. § 6103 authorized these disclosures.

108.    The DOGE-affiliated individuals who accessed Treasury's systems and the return information therein functioned as officers or employees of the United States. Treasury issued those individuals government credentials and equipment, placed them within Bureau of the Fiscal

Service facilities, supervised their access and work on a day-to-day basis, controlled the scope and parameters of their access, and retained authority to revoke that access. Those individuals were subject to applicable government data security obligations as a condition of their access, consistent with the status of a government officer or employee.

109. These disclosures were knowing and willful. Secretary Bessent was specifically advised by David Lebryk, the career official then in charge of the Bureau of the Fiscal Service, that the Bureau's records were proprietary and sensitive and that providing access to outside parties would violate the law. Notwithstanding this warning, Secretary Bessent placed Mr. Lebryk on administrative leave and proceeded to grant DOGE access to the Bureau's systems. DOGE personnel subsequently transmitted return information outside the agency, including through unapproved third-party servers and unencrypted communications in violation of Bureau policy, as confirmed in the government's own court filings in related litigation.

110. Defendants' conduct in authorizing and maintaining DOGE access to the Taxpayer Subclass's return information was at least grossly negligent and, in many respects, willful and intentional. Despite clear statutory limits in 26 U.S.C. § 6103, longstanding Treasury and IRS guidance on confidentiality, and repeated internal and external warnings about the sensitivity of the Bureau of the Fiscal Service's payment and disbursement systems, Defendants:

    a.    removed or sidelined career officials who refused to grant DOGE access;

    b.    affirmatively granted DOGE-affiliated individuals full, continuous, and ongoing access to systems containing return information for millions of taxpayers; and

    c.    allowed those individuals to copy and transfer such information to external servers and personal devices for non-tax-administration purposes. Defendants did

not promptly halt these disclosures, did not implement basic safeguards to prevent further misuse, and did not provide timely notice to affected taxpayers.

111.    Taken together, these actions reflect a severe departure from the standard of care Congress imposed in § 6103 and constitute, at minimum, gross negligence within the meaning of 26 U.S.C. § 7431(c)(1)(B), and, in many instances, intentional or willful misconduct.

112.    Each 'act of unauthorized inspection or disclosure' within the meaning of 26 U.S.C. § 7431(c)(1)(A) includes each discrete communication, transfer, or access event in which DOGE-affiliated individuals obtained or transmitted Taxpayer Subclass Members' return information, including but not limited to the grant of system level access to DOGE-affiliated individuals, the transmission of files containing return information, the transfer of data from Treasury and SSA systems to external or third-party locations, and the copying of such data to removable media. Plaintiffs and the Taxpayer Subclass seek statutory damages of $1,000 for each such act of unauthorized inspection or disclosure, as well as actual and punitive damages where proven.

113.    As a direct and proximate result of the United States' unauthorized disclosure of their return information, Plaintiffs Hertlein, Custer, and Titko, and Members of the Taxpayer Subclass, have suffered actual damages, including costs of credit monitoring and identity-theft protection services, time and money expended to address and remediate actual and attempted fraud, and the loss of their statutory right to the confidentiality of their tax information. Plaintiffs and the Taxpayer Subclass are entitled to the greater of their actual damages or $1,000 per unauthorized disclosure, punitive damages for willful or grossly negligent disclosures, costs, and reasonable attorney's fees pursuant to 26 U.S.C. § 7431(a)(1) and (c).

114.    Statutory damages on a per-taxpayer basis (primary theory). 26 U.S.C. § 7431(c)(1)(A) entitles Plaintiffs and the Taxpayer Subclass to statutory damages of $1,000 "for each act of unauthorized inspection or disclosure" of return information. Section 7431(a)(1) frames the cause of action in terms of a violation "with respect to a taxpayer." Read together, those provisions measure statutory damages on a per-taxpayer basis. Each Plaintiff and each Member of the Taxpayer Subclass whose return information was, without authorization, made accessible to or disclosed to DOGE-affiliated personnel is therefore entitled to recover the greater of actual damages or $1,000.

115.    Statutory damages on a per-act basis (alternative theory). In the alternative, and at a minimum, Plaintiffs and the Taxpayer Subclass are entitled to $1,000 in statutory damages for each discrete "act of unauthorized inspection or disclosure" under 26 U.S.C. § 7431(c)(1)(A), including but not limited to the following acts: (a) Secretary Bessent's authorization, on or about January 31, 2025, granting DOGE-affiliated individuals access to the Bureau of the Fiscal Service's payment and disbursement systems and the return information contained therein; (b) the unauthorized transmission by Marko Elez of an unencrypted spreadsheet containing return information from Treasury's payment systems to recipients outside the Department; (c) the unauthorized transfer of data, including return information, to and through third-party servers operated by Cloudflare, as acknowledged in the government's January 2026 Notice of Corrections to the Record in *American Federation of State, County & Municipal Employees v. Social Security Administration*, No. 1:25-cv-00596-ELH (D. Md.); (d) the alleged copying and removal of SSA database records onto a thumb drive, as described in the January 2026 whistleblower disclosure to the SSA Inspector General; and (e) any additional discrete acts of inspection, copying,

34

transmission, or disclosure of return information by DOGE-affiliated personnel without authorization under 26 U.S.C. § 6103, to be identified through discovery.

**COUNT TWO**
**Violation of the Privacy Act of 1974, 5 U.S.C. § 552a**
**against Defendants OPM, SSA, Treasury**
**(On Behalf of Plaintiffs and the Class)**

116.    Plaintiffs hereby incorporate by reference each and every material fact contained in the preceding paragraphs of this Complaint.

117.    OPM, SSA, and the Treasury are agencies within the meaning of the Privacy Act.

118.    Pursuant to 5 U.S.C. § 552a(b), agencies are prohibited from disclosing any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains.

119.    Pursuant to 5 U.S.C. § 552a(e)(10), each agency that maintains a system of records shall "…establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."

120.    Defendants obtained and preserved Plaintiffs' and Class Members' PSI in a system of records during the recruiting and security check processes.

121.    Defendants are therefore prohibited from disclosing federal applicants' PSI under 5 U.S.C. § 552a(b) and are responsible for establishing appropriate safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity under 5 U.S.C. § 552a(e)(10).

35

122.    Defendants are, and at all relevant times were required by law to comply with both FISMA and the Modernization Act. OPM, SSA, and the Treasury are also responsible for ensuring that their cybersecurity systems comply with 5 U.S.C. § 552a and other rules and regulations governing cybersecurity practices.

123.    Defendants' intentional and willful failures are further demonstrated by their noncompliance with the Federal Information Security Modernization Act (FISMA). Although FISMA does not create a private right of action, Defendants' disregard of FISMA's requirements establishes that their failures to safeguard Plaintiffs' PSI were willful and intentional within the meaning of the Privacy Act. However, through a continuous course of conduct beginning in January 2025, Defendants intentionally and willfully failed to implement and maintain information security programs for OPM, SSA, and Treasury that complied with the Federal Information Security Modernization Act (FISMA).

124.    Specifically, Defendants OPM, SSA, and Treasury were required—but failed—to take several steps mandated by 44 U.S.C. § 3554 and related provisions, including but not limited to the following:

       a.    Providing information security protections commensurate with the risk and magnitude of the harm that could result from unauthorized access, use, disclosure, disruption, modification, or destruction of information and information systems that support agency operations, 44 U.S.C. § 3554(a)(1)(A);

       b.    Conducting periodic assessments of the risk and magnitude of the harm that could result from unauthorized access, use, disclosure, disruption,

modification, or destruction of such information and information systems, 44 U.S.C. § 3554(a)(2)(A);

c. Maintaining information security, defined as protecting information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction in order to provide, among other things, "confidentiality," meaning preserving authorized restrictions on access and disclosure, including means for protecting personal privacy and proprietary information, 44 U.S.C. § 3552(b)(3)(A), (B);

d. Ensuring that all personnel are held accountable for complying with the agency-wide information security program, 44 U.S.C. § 3554(a)(7); and

e. Ensuring that all incidents of unauthorized disclosure or access to protected employee data, such as Plaintiffs' PSI, are reported to Congress by the head of the agency, including information about how the breach occurred and "an estimate of the number of individuals affected by the breach and assessment of risk of harm to those individuals," 44 U.S.C. § 3554(c)(1)(A)(iii).

125. Through a continuous course of conduct, OPM, SSA, and Treasury thus willfully, intentionally and with flagrant disregard refused to take steps to implement appropriate safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity, including by giving access to Plaintiffs' PSI data stored on OPM's, SSA's, and the Treasury Department's computer systems to individuals without a lawful or legitimate need for such data, without proper security clearances to access such data, and, in some cases, without those individuals being government employees at the time of disclosure.

126.    Defendants' actions resulted in (1) the disclosure of Plaintiffs' and Class Members' records without prior written consent in violation of 5 U.S.C. § 552a(b) and, ultimately, (2) the substantial harm, embarrassment, inconvenience, or unfairness to Plaintiffs and Class Members that 5 U.S.C. § 552a(e)(10) is designed to protect against.

127.    With respect to Members of the Taxpayer Subclass, this Count challenges Defendants' unauthorized disclosure of PSI other than 'returns' and 'return information' as those terms are used in 26 U.S.C. § 6103; claims arising from the disclosure of 'return information' are asserted under 26 U.S.C. § 7431 in Count I.

128.    As a result of the Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages and pecuniary losses within the meaning of the Privacy Act as set forth herein.

129.    Plaintiffs and Class Members are thus entitled to relief pursuant to 5 U.S.C. § 552a(g)(1)(D) and (g)(4).

## COUNT THREE
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706
### against Defendants OPM, SSA, and Treasury
### (On Behalf of Plaintiffs and the Class)

130.    Plaintiffs hereby incorporate by reference each and every material fact contained in the preceding paragraphs of this Complaint.

131.    The APA authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

132.    Defendants' decisions to grant DOGE-affiliated individuals access to the systems of records described herein constitute final agency action subject to judicial review under the APA. Each Defendant agency took discrete, consummated actions—including authorizing credentials,

38

granting system access, and approving data transfers—from which legal consequences flowed to Plaintiffs and Class Members.

133.    Defendants' actions were "not in accordance with law" within the meaning of 5 U.S.C. § 706(2)(A) because they violated the Privacy Act, 5 U.S.C. § 552a(b) and (e)(10), and the confidentiality requirements of the Internal Revenue Code, 26 U.S.C. § 6103, as alleged above.

134.    Defendants' actions were also "arbitrary, capricious, [and] an abuse of discretion" within the meaning of 5 U.S.C. § 706(2)(A) because Defendants failed to consider the privacy interests of Plaintiffs and Class Members, failed to follow their own disclosure policies and procedures, failed to ensure that DOGE-affiliated individuals had appropriate security clearances and training, and failed to conduct the assessments required before altering access to systems of records.

135.    Plaintiffs and Class Members have no adequate remedy at law for the prospective and ongoing harms caused by Defendants' actions. Neither the Privacy Act's damages provision, 5 U.S.C. § 552a(g)(1)(D), nor the Internal Revenue Code's damages provision, 26 U.S.C. § 7431, authorizes the declaratory and prospective injunctive relief necessary to prevent continuing and future harm to Plaintiffs and Class Members.

136.    Pursuant to 5 U.S.C. §§ 702 and 706, Plaintiffs are entitled to a declaration that Defendants' actions are unlawful and an order setting aside those actions, including an order requiring Defendants to revoke DOGE-affiliated individuals' access to the systems of records at issue, to delete or return any data improperly accessed or copied, and to implement safeguards sufficient to prevent further unauthorized disclosures.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendants through an Order:

A.  certifying this case as a class action, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel to represent the Class;

B.  finding Defendants liable for their willful failure to ensure the security of Plaintiffs' and Class Members' PSI;

C.  requiring Defendants to pay money damages, including actual and statutory damages, to Plaintiffs and Class Members;

D.  declaring that the relevant conduct of Defendants is unlawful, and that Defendants shall indemnify and hold harmless any Class Member who has sustained or will sustain economic injury as a result of the unauthorized disclosures;

E.  enjoining Defendants to extend free lifetime identity theft and fraud protection services, including credit monitoring and identity theft insurance, to Plaintiffs and the Class;

F.  awarding reasonable attorneys' fees and costs as may be permitted by law;

G.  awarding pre-judgment and post-judgment interest as may be prescribed by law; and

H.  granting such further and other relief as may be just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 8, 2026

Respectfully submitted,

*/s/ Gary E. Mason*

Gary E. Mason (DC Bar No. 418073)
Danielle L. Perry (DC Bar No. 1034960)
Salena J. Chowdhury (DC Bar No. 90010584)
**MASON & PERRY LLP**
5335 Wisconsin Avenue NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com
Email: schowdhury@masonllp.com

Cyrus Mehri (DC Bar No. 420970)
Richard Condit (DC Bar No. 417786)
Dee Um (DC Bar No. 90027840)
**MERHI & SKALET, PLLC**
2000 K Street, NW
Suite 325
Washington, D.C. 20006
Email: cmehri@findjustice.com
Email: rcondit@findjustice.com
Email: dum@findjustice.com

*Attorneys for Plaintiffs*

41